# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (NORTHERN DIVISION)

|  |  |  |
|---|---|---|
| **THE BALLENGER GROUP, LLC** | ) | |
| 321 Ballenger Center Drive | ) | |
| Frederick, MD  21703 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No.** _____ |
| | ) | |
| **CREDICURE, INC.** | ) | |
| 301 North Mildred Street | ) | |
| Charles Town, WV  25414 | ) | |
| | ) | |
| Serve On: | ) | |
| Jeffrey Formulak | ) | |
| Resident Agent | ) | |
| CrediCure, Inc. | ) | |
| 301 **North** Mildred Street | ) | |
| Charles Town, WV  25414 | ) | |
| | ) | |
| Richard **A.** Brennan | ) | |
| General Counsel | ) | |
| CrediCure, Inc. | ) | |
| 301 North Mildred Street | ) | |
| Charles Town, WV  25414 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## VERIFIED COMPLAINT
### FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT AND
### <u>BREACH OF CONTRACT</u>

Plaintiff, The Ballenger Group, LLC ("Ballenger") **by** and through its undersigned attorneys sues

Defendant, CrediCure, Inc. ("CrediCure"), and alleges as follows:

**The Parties**

1.      Ballenger is a Delaware limited liability company that maintains its principal place of business in Frederick, Maryland, where it employs approximately 230 people.  Ballenger is a company that provides outsourcing services to credit counseling agencies ("CCAs"), whom consumers contact for help with managing and establishing a plan to pay off their debts.

2.      CrediCure is a Florida corporation that maintains its principal place of business in Charles Town, West Virginia.  CrediCure is a CCA that outsources its consumer debt payment processing and related technology needs to Ballenger pursuant to a Fulfillment Agreement between **the** parties dated April 1,2003 (the "Fulfillment Agreement").  *See* Fulfillment Agreement, attached at **Exhibit A.**

**Subject Matter Jurisdiction**

3.      This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1).  This civil action involves a justiciable controversy between citizens of different states and the amount in controversy in the declaratory judgment and breach of contract claims, and the damages that plaintiff would suffer in the absence of injunctive relief, substantially exceed $75,000, exclusive of interest and costs.

**Venue**

4.      Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to **the** claim occurred and a substantial part of the property that is the subject of this action is situated in Maryland.  Moreover, the Fulfillment Agreement at issue in this action contains a clause stating that its terms are governed by Maryland law and that any litigation arising under that Agreement "must be brought in a federal or state court in Maryland, and Ballenger

and Agency [CrediCure] hereby irrevocably submit to the jurisdiction of such courts." *See* Fulfillment Agreement, Exh. A, § 10.2.

## Factual Background

**A.      Brief history of the credit counseling industry.**

　　5.      Creditors created non-profit CCAs in the 1950s to provide consumers debt counseling, education and debt management services as an alternative to bankruptcy – and as a means of collecting more from consumers than the creditors would otherwise have obtained in bankruptcy.

　　6.      Today, nearly all CCAs remain tax exempt organizations under Section 501(c)(3) of the Internal Revenue Code and continue to provide debt counseling and education services to consumers and, in many cases, place consumers in debt management or repayment plans ("DMPs").

　　7.      CCAs or third parties retained by CCAs negotiate the terms of DMPs with creditors.  The DMPs may provide, for example, reduced minimum payments, elimination of late charges and penalties, elimination of over-the-limit fees, reduced interest rates, and other benefits – in exchange for the consumer's agreement to make one consolidated payment to the CCA each month that the CCA would divide among its creditors.

　　8.      Since **the** 1950s and still today, creditors have paid CCAs so-called "fair share payments" as consideration for the CCAs' brokering of the DMPs.  **A** fair share payment is, in most cases, a percentage of the monthly payment made by each debtor to the creditor pursuant to a DMP.  CCAs may also receive voluntary initial and monthly contributions from debtors participating in DMPs.

　　9.      Since the 1950s, consumer debt has skyrocketed, resulting in a dramatic increase in the demand for consumer counseling services.  The negotiation and administration of DMPs has, during the

same period, grown increasingly complex and labor intensive.  CCAs also incur substantial expenses

when administering DMPs on behalf of their consumers.

10.     To relieve themselves of the heavy burden of administering DMPs and to permit them to

redirect energy, time and resources to provide better debt education and counseling services to

consumers, CCAs began "outsourcing" the administration of DMPs to third-party outsourcing providers.

**B.     Ballenger's role as an outsourcing company and the importance of its
        activities to consumers.**

11.     Ballenger is a for-profit limited liability company that began doing business as a provider

of outsourcing solutions to CCAs on January 1, 2003.  Through efficient **use** of new technologies,

Ballenger is able to cost-effectively provide CCAs with the complex and labor intensive "back-office"

services necessary to properly administer DMPs.

12.     Ballenger is <u>not</u> a CCA and it does not provide credit counseling services to consumers,

enter into contracts with consumers, nor enroll consumers in DMPs.  Ballenger also does not receive any

compensation directly from consumers; it is compensated only by CCAs pursuant to "fulfillment

agreements" that Ballenger and CCAs reach pursuant to arms-length negotiations.

13.     Ballenger's CCA clients receive all initial consumer debtor contacts, gather information

from each consumer about their debt, and discuss the various options available to the debtor for

addressing their debt problem (including the establishment of a DMP).  If a debtor agrees to enter into a

DMP, the CCA prepares a proposed DMP based upon the information that the debtor provided and

sends the debtor a consumer package that includes a DMP contract between the CCA and the customer.

Once the customer returns the executed DMP contract and a first monthly payment to the CCA, the

CCA sends the consumer's file to Ballenger for servicing.

- 4 -

14.     Ballenger provides three general categories of outsourcing services to CCAs and their debtor clients:

A.     Data entry.  Ballenger maintains DMP management software that tracks information necessary to administer DMPs and handle all correspondence with creditors regarding the establishment, terms and administration of those DMPs.  Ballenger also sends letters, on behalf of a CCA, to the CCA's consumers informing them of any proposed adjustments or other information that may affect their DMP.

B.     Payment processing.  Ballenger receives more than 127,000 monthly payments from CCA consumers and deposits those payments into trust accounts that each CCA establishes, from which Ballenger makes regular disbursements to creditors in accordance with debtors' DMPs.  Ballenger transmits more than 1,000,000 disbursement payments to creditors each month.  The average time between receipt of a debtor's payment and disbursement from the trust account (the "Disbursement Lag") is approximately 3.8 days, – exceeding industry standards.  Ballenger also collects the fair share payments from creditors, on behalf of CCAs and deposits them into trust accounts for disbursement to the CCAs.

C.     Customer service.  Ballenger's third primary function is to provide customer service for payment issues to the CCA's clients and their creditors.  Thus, if a debtor has a problem with a particular creditor or with his or her DMP payment, the debtor calls Ballenger to complain and resolve the issue.  Ballenger also, among other services, attempts to resolve disputes between CCAs and creditors.

15.     Although Ballenger services DMPs for CrediCure and other CCAs, debtors still send their payments addressed to the CCAs (and make checks and money orders payable to the CCAs),

receive correspondence from Ballenger on the CCA letterhead, and otherwise perceive that the CCA they initially contact is servicing its DMP and handling their complaint and inquiry calls.

16.     Once a consumer begins making payments pursuant to a DMP, the consumer expects that all payments made will be distributed in a timely manner and in accordance with their DMP to pay down their debt.

17.     Failure to make even a single DMP payment on time could have serious consequences for consumers.  Creditors often impose late fees, over-the-limit fees, increased interest rates and other penalties – and provide negative reports to credit reporting agencies – all of which consumers seek to avoid by contacting CCAs and enrolling in DMPs.  Creditors may even cancel a consumer's DMP altogether in response to even a single late payment, leaving the consumer in the same financial distress that he or she was in when they sought a CCAs help.

18.     Ballenger has developed a number of key business initiatives to ensure that consumer DMPs are serviced timely and correctly, including:

A.     Developing and implementing industry-wide "best practices" and legislative/regulatory compliance initiatives, including certification by the International Organization for Standardization to help CCAs improve their processes and improve customer satisfaction;

B.     Developing new technology initiatives that allow CCAs to reduce paperwork and provide more counseling and education for CCA clients, provide better notice to CCA clients of DMP adjustments requested by creditors, and to improve the overall customer satisfaction of CCA clients – including more reliable and timely disbursements from trust accounts to creditors;

C.     Creating payment processing initiatives, like electronic fund transfers, which lower the costs of processing DMPs; and

- 6 -

       D.      Developing pricing initiatives that lower fees to each CCA that adopts its technology and best practices guidelines.

19.     Because of these and other key business initiatives, in addition to Ballenger's industry-low Disbursement Lag, Ballenger has developed a good reputation and has built goodwill in the credit counseling industry as a reliable and trustworthy outsourcing provider.  Ballenger is considered an industry leader and the "gold standard" in DMP payment processing.

20.     It is that goodwill and reputation that accounts for Ballenger's ability to retain current CCA clients and its ability to attract new CCAs that are interested in improving customer satisfaction while, at the same time, decreasing their administrative costs and increasing their education and counseling activities.   Simply put, CCAs hire Ballenger to administer DMPs because of its industry-leading practices and its reputation of increasing CCA customer satisfaction.

21.     Ballenger also has developed a good reputation with creditors, who agree to work with Ballenger and accept its debtor payments because Ballenger is recognized as a trustworthy and reputable company that sends payments on time, and without problem (such as bounced checks, etc.)

## C.    Ballenger's contractual relationship with CrediCure

22.     CrediCure is one of the not-for-profit CCAs for which Ballenger provides the services described above.

23.     Ballenger first began providing services to CrediCure on January 1, 2003, pursuant to a fulfillment agreement that was assigned to Ballenger as part of a transaction in which Ballenger obtained substantially all of its business assets from an entity that had previously provided outsourcing services to CrediCure.

- 7 -

24.     Ballenger and CrediCure negotiated and entered into a new Fulfillment Agreement on April 1, 2003. *See* Fulfillment Agreement, Exh. A.

25.     Pursuant to the new Fulfillment Agreement, CrediCure retained Ballenger to provide many of the outsourcing services described above to approximately two thousand (2000) of its debtors who entered into DMPs, like receiving and processing DMP payments; disbursing DMP payments to the appropriate creditors in the appropriate amount; handling fair share payments and disbursing them to CrediCure; and responding promptly to consumer inquiries regarding disbursements and balances. *See id.*

26.     To facilitate payment processing, the Fulfillment Agreement requires CrediCure to establish and maintain a trust account with a federally insured depository institution, into which payments that Ballenger receives from CrediCure's consumer clients are deposited and then distributed to creditors. *See id.* at §2.3 ("Section 2.3")

27.     Pursuant to Section 2.3, CrediCure established, in its own name, a trust account with BB&T Bank in Frederick Maryland (the "Trust Account").

28.     Under Section 2.3, CrediCure is required to "afford Ballenger full access" to the Trust Account and the Trust Account is to "be used solely by Ballenger" for depositing DMP payments from consumers, disbursing refunds to consumers, disbursing consumers' DMP payments to creditors and disbursing fair share payments and voluntary contributions to CrediCure. *See id*

29.     Section 2.3 further provides that:

> [a]ny interference with Ballenger's access to [the] Trust Account[] which would prevent Ballenger from performing its duties or exercising its rights under this Agreement, including Agency's [CrediCure] writing any check or withdrawing any funds from the Trust Account[], will be deemed a substantial breach of this Agreement entitling Ballenger to terminate this Agreement ….

- 8 -

*See id,* (although Section 2.3 refers to "Trust Accounts" in the plural, there was only one Trust Account created by CrediCure from which Ballenger made disbursements).

30.     Approximately 840 Credicure debtors make DMP consolidation payments by paper made payable to CrediCure but received by Ballenger (check, money order, Western Union, etc.) and approximately 1,160 have authorized direct debit from their personal bank account to the Trust Account. Ballenger receives between 40 and 50 paper payments from debtors each day that are made payable to CrediCure and that it must deposit into the CrediCure Trust Account.  The average payment is $373.00 – meaning that Ballenger receives between $14,920 and $18,600 in paper payments each day. After depositing paper payments into the Trust Account and waiting a couple of days for them to clear, Ballenger disburses those funds to the debtors' creditors in accordance with their DMPs.

31.     CrediCure also contracted Vanco Services, LLC ("Vanco"), a third-party company that provides electronic funds transfer services, to disburse funds electronically from the Trust Account. Although it was CrediCure that contracted Vanco, Ballenger provides disbursement instructions to Vanco with respect to those creditors who accept Vanco electronic fund transfer payments.  Ballenger drafts between **40** and 50 checks each day on behalf of CrediCure to pay those creditors who do not accept Vanco electronic funds transfers.

32.     As consideration for Ballenger's Trust Account management and the other services that Ballenger would provide pursuant to the Fulfillment Agreement, CrediCure agreed to pay Ballenger a one-time fee of fifty (50) dollars for each new DMP transferred to Ballenger (called a "Set-up Fee"); and a monthly fee of twenty five (25) dollars for each Debtor from whom Ballenger receives payment or for whom it makes a disbursement.  *See id.* at § 4.1.

- 9 -

33.     Ballenger submits monthly invoices to CrediCure, which CrediCure is required to pay no later than ten days after the date of the invoice. *See id.* at 54.4.  If CrediCure fails to make timely payment of invoiced amounts, Ballenger has the right to withdraw the amount of overdue fees from the Trust Account by electronic funds transfer. *See id.* at 54.6.

34.     The Fulfillment Agreement also provides that CrediCure "must give Ballenger written notice of any disputed invoices within ten calendar days of the date of invoice." *See id.* at §4.4.

35.     Because CrediCure was still in the development phase at the time it entered into the Fulfillment Agreement, Ballenger agreed to an amendment of the Fulfillment Agreement with respect to the payment of fees.  That amendment, dated July 1, 2003: (i) provided CrediCure with a line of credit in the amount of the fees that it owed pursuant to the Fulfillment Agreement from July 1, 2003 through August 31, 2003; (ii) permitted CrediCure to make partial payments of fees in September and October of 2003; and (iii) permitted CrediCure to pay past receivables in monthly installments over the course of ten months, beginning in December of 2003.  *See* Amendment to Fulfillment Agreement ("Amendment"), attached at **Exhibit B.**

36.     The Fulfillment Agreement also provides that CrediCure may terminate the Agreement by providing written notice to the other party if, among other things, creditors refuse to make fair share payments to CrediCure by virtue of Ballenger's provision of outsourcing services. *See* Fulfillment Agreement, Exh. A, §6.3.

37.     Any termination pursuant to Section 6.3, however, is considered a "partial termination" of the Fulfillment Agreement subject to Section 6.4.1, which provides in relevant part:

> Upon termination of this Agreement … [CrediCure] and Ballenger will have no further obligations to each other with respect only to new debtors who enroll in DMPs after the effective date of termination.  Ballenger will

- 10 -

retain permanent process rights for Debtors enrolled in DMPs before the
effective date of termination ("Existing Debtors") ....

38.    Thus, under Section 6.4.1, even if there is a partial termination of the agreement pursuant

to Section *6.3* for creditors' failure to make fair share payments to CrediCure, Ballenger still retains the

right to <u>process</u> all "Existing Debtors" for which it was already providing DMP management services as

of the date of termination, although Ballenger never retains the actual debtor as a client or customer.  *See*

*id.*

39.    Section 10.5 of the Fulfillment Agreement similarly provides for Ballenger's right to

continue processing payments made by Existing Debtors, by providing that:

> Notwithstanding termination or expiration of this Agreement, Agency
> hereby appoints Ballenger as the exclusive provider of Services for
> Debtors for whom Ballenger has performed any Services under this
> Agreement, for the duration of the DMP for each such Debtor.  Agency
> irrevocably appoints Ballenger as its agent, coupled with an interest, for
> this purpose.  Agency shall not, except through Ballenger and pursuant to
> the terms of this Agreement, (i) perform any back office, fulfillment, or
> customer relations services for its Debtors or the clients of any other entity
> ....

40.    Section 6.4.2 provides an additional remedy to Ballenger "upon or after partial

termination'' of the Fulfillment Agreement in the event that CrediCure is, at the time of termination, "in

material breach of this Agreement and such breach is not cured within 30 days after Agency receives

notice of such breach from Ballenger."  *See id.* at §6.4.2.  Thus, it provides that:

> Ballenger may, at its sole option ... fully terminate this Agreement and
> assign Existing Debtors to one or more other credit counseling agencies ...
> of Ballenger's choosing, including companies that may be clients of
> Ballenger's, and Agency hereby irrevocably appoints Ballenger as its
> agent, couple with an interest, for this purpose.

41.    In the event that Ballenger exercises its unilateral right under Section 6.4.2 to affect

CrediCure's assignment of Existing Debtors to another CCA, Ballenger also is permitted to "send a

notice to Debtors on behalf of [CrediCure], and including [CrediCure's] Marks [*i.e.*, trademarks] in such notice, informing Debtors that their DMPs will be or have been assigned to a new credit counseling agency." *See id.*

42.     Thus, under the Fulfillment Agreement, if CrediCure were to partially terminate its agreement pursuant to Section 6.3 because of creditors' failure to make fair share payments, and if CrediCure was, at the time of that partial termination, in material breach of the Fulfillment Agreement and failed to cure that breach within 30 days after receiving notice, Ballenger would have a right to carry out CrediCure's assignment of Existing Debtors to another CCA and send those debtors notice under CrediCure's trademark that their DMPs had been reassigned.  See *id.*

43.     The Fulfillment Agreement provides that "[t]he failure of a party to require the performance of any term of this Agreement … shall not prevent a subsequent enforcement of such term nor be deemed a waiver of any subsequent breach." *See id.* at §10.8

44.     The Fulfillment Agreement also provides that "The prevailing party in any legal action brought by one party against the other arising out of this Agreement will be entitled, in addition to any other rights or remedies it may have, to reimbursement of its legal expenses incurred in such action, including court costs and reasonable attorneys' fees." *See id.* at §10.4.

**D.     CrediCure's actual and anticipatory breach of the Fulfillment Agreement.**

45.     CrediCure has not made a single payment to Ballenger since January of 2003 and, as of February 24, 2004, owes Ballenger $478,979 – a balance that continues to grow each day.  CrediCure did not give written notice that it disputed any of the invoices that reflect, in the aggregate, the amount that it now owes Ballenger. *See id.* at § 4.4.

46.     As part of a concerted effort to work with CrediCure, Ballenger refrained from exercising its right to withdraw funds from the Trust Account to satisfy CrediCure's outstanding balance.

47.     By letter dated January 12, 2004, Ballenger's Chief Financial Officer, Michael Malesardi, provided written notice to CrediCure that it had materially breached the Fulfillment Agreement by failing to pay its past-due fees.  *See* January 12, 2004, letter from Michael Malesardi to Jeffrey Formulak, Executive Director of CrediCure, attached at **Exhibit C.**

48.     By letter dated February 20, 2004, e-mailed by CrediCure's general counsel, Richard A. Brennan ("Brennan") to Ballenger, CrediCure claimed that "[c]reditors have begun notifying CrediCure, Inc. that association with for profit processing entities such as Ballenger Group, LLC will result in cessation of fair share contributions," and that "[t]his makes it impossible to continue on with any business arrangement with [Ballenger]."  Brennan's letter also makes a broad, unsupported claim that the Fulfillment Agreement violates Maryland law.  Based upon those and other allegations in Brennan's letter, CrediCure demanded: (i) that Ballenger immediately stop providing all services pursuant to the Fulfillment Agreement except disbursement of DMP payments to creditors, which CrediCure demanded Ballenger continue until March 1, 2004; (ii) that Ballenger cease disbursement of consumer DMP payments to creditors as of March 1, 2004; and (iii) that Ballenger return to CrediCure all files related to CrediCure's approximately 2,000 consumer clients by March 1, 2004.  Finally, CrediCure stated that, as of March 1, 2004, it would he processing consumer DMP payments itself and that, as of that date, Ballenger would have no authority to continue servicing existing CrediCure debtors.  *See* February 20, 2004, letter from Brennan to Kevin Fortuna, Chief Operating Officer of Ballenger (the "February 20 Brennan Letter"), attached at **Exhibit D.**

- 13 -

49.     The February 20 Brennan Letter was carbon copied to, among others, BB&T, the holder

of the Trust Account, and to Vanco, the company providing electronic funds transfer services from the

Trust Account. *See id.*

50.     By e-mail dated February 23, 2004, CrediCure clarified that it would be terminating its

contract pursuant to Section 6.3 of the Fulfillment Agreement because of the creditors' apparent refusal

to make fair share payments, as the February 20 Brennan Letter alleged. *See* February 23, 2004, e-mail

from Brennan to Ballenger general counsel, Andre Brunel (the "February 23 Brennan E-mail"), attached

at **Exhibit E.**

51.     The February 23 Brennan E-mail also claims that "as of March 1, 2004, Ballenger will no

longer have the means to transmit payments for CrediCure, Inc." leaving, according to Brennan, "the

only viable option of having CrediCure, Inc. perform the disbursement of client funds to creditors." *See*

*id.*

52.     On February 23, 2004, Ballenger learned from Vanco that, as early as January of 2004,

CrediCure had notified Vanco that it no longer intended to use Ballenger's services and that CrediCure

had instructed Vanco not to follow Ballenger's payment directions effective as of March 1, 2003.

Vanco informed Ballenger that it intends to comply with CrediCure's instructions – effectively

preventing Ballenger from disbursing any funds from the Trust Account in accordance with consumer

DMPs. Vanco's decision to stop disbursements on March 1, 2004, effectively prevents Ballenger from

making any Trust Account disbursements with respect to all creditors that accept Vanco electronic funds

transfers after Wednesday, February 25, 2004, for the following reason. Vanco waits two business days

after a consumer's payment is deposited into the Trust Account before transferring those funds to

creditors in accordance with Ballenger's instructions. Thus, if Ballenger directs Vanco to transfer funds

- 14 -

on Thursday, February 26, 2004, Vanco ordinarily would wait until Monday, March 1, 2004 – the end of the two-day waiting period – before disbursing the funds. Because Vanco intends to comply with CrediCure's instructions not to disburse any funds at Ballenger's direction as of March 1, 2004, Ballenger's disbursement instructions would be ineffective on Thursday, February 27, 2004, and beyond.

53.    BB&T, the bank that holds the Trust Account, also has notified Ballenger that it intends to follow whatever instructions that CrediCure gives it, since the Trust Account is in the name of CrediCure – including instructions to prevent Ballenger from writing disbursement checks on the Trust Account or otherwise accessing it.

54.    On information and belief, at or about the same time that CrediCure notified Vanco that it no longer intended to **use** Ballenger's services – that is, in January of 2004 – CrediCure also approached the third-party provider of Ballenger's DMP management software, HISPACOM, Inc. d/b/a/ ICCO ("ICCO") to request a license for the software.

55.    Ballenger learned of CrediCure's request and notified ICCO by e-mail of ICCO's obligations under its license agreement with Ballenger for the "CrediSoft" software – which prohibits ICCO from licensing the software to any of Ballenger's CCA clients, both during Ballenger's contractual relationship with the CCAs and for three months afterwards. See January 14, 2004, e-mail correspondence between Carlos Gonzalez of ICCO and Mr. Fortuna of Ballenger, attached at **Exhibit F;** *see also* Exhibit A to September 28, 2001, License Agreement between ICCO and DebtWorks, Inc. – later assigned to and assumed by Ballenger (the "CrediSoft License Agreement"), to be attached at **Exhibit G,** following consent of Plaintiffs Motion to File Under Seal.

- 15 -

56.     Pursuant to Ballenger's January 14,2004, e-mail ICCO informed Ballenger that it had received an original, signed contract from CrediCure and a first payment – but that, because of the License Agreement, CrediSoft had returned the contract to CrediCure unsigned (and the payment).  *See* January 14,2004 e-mail, Exh. F.

57.     The February 23 Brennan E-mail claims that ICCO informed Mr. Brennan that Ballenger's "client files [that it maintains and processes using the CrediSoft program] can be sent in a data file that is relatively easily created and sent or transported."  *See id.*

*58.*     CrediCure, however, has no right or authority to possess or use ICCO's CrediSoft software to process or otherwise administer DMPs, even if it did obtain the data file from Ballenger.  *See id.; see also* License Agreement, Exh. G.

59.     Moreover, by e-mail on February 24,2004, CrediSoft again reestablished that CrediCure does not have a copy of, or access to, the CrediSoft software.  *See* February 24,2004, e-mail from CrediSoft to Kevin Fortuna of Ballenger, attached at **Exhibit H.**

60.     Thus, CrediCure would not be entitled to use the CrediSoft software – nor could it to the best of Ballenger's information and belief – to service the DMP files, even if they could be "easily created and sent or transported" as the February 23 Brennan E-mail claims.

61.     Moreover, upon information and belief, CrediCure does not possess the requisite knowledge, skills, facilities, personnel, technology and other resources that are necessary to process DMP payments made its clients – and avoid the devastating consequences to consumers of making late payments – or no payments at all – on DMPs.

62.     To mitigate its damages and to prevent financial injury to as many CrediCure debtors as possible, Ballenger assigned CrediCure's debtors to two of its other CCA clients pursuant to its rights

- 16 -

under Section 6.4.2 of the Fulfillment Agreement, effective February 25, 2004.  Consequently, all electronic debits of debtor accounts will go to trust accounts not owned by CrediCure and Ballenger will distribute those payments to creditors as they should be.

63.     However, with respect to the 40 to 50 paper checks and money orders that are made payable to CrediCure that Ballenger receives each day, see *supra* ¶ 32, Ballenger still has no choice but to deposit those payments into the CrediCure Trust Account – from which it must make either electronic disbursements to creditors through Vanco, or draft paper disbursement checks to those creditors who do not accept Vanco electronic fund transfers.  CrediCure's actions will prevent Ballenger from effecting any type of disbursement.  Each day, Ballenger must make approximately 200 to 250 disbursements – approximately 200 of them electronic; the remaining 50 by paper – to satisfy debtors' obligations under DMPs.

### Count I – Reauest for Temporary Restraining Order

64.     Ballenger incorporates by reference Paragraphs 1 through 63 of its Verified Complaint as if set forth fully herein.

65.     Plaintiff seeks an injunction that seeks to maintain the status quo by permitting Ballenger to disburse funds from the Trust Account that debtors paid under the belief that, as in the past, their funds would be redistributed among their creditors in accordance with their DMPs.

66.     Plaintiff will suffer irreparable harm to its goodwill and reputation in the industry in the absence of an injunction.  Ballenger's business success is dependent almost entirely upon its reputation as the "gold standard" in DMP payment processing.  In the absence of an injunction, Ballenger will not be able to make the 200 to 250 disbursements from the Trust Account to creditors that it must make every day in accordance with debtors' DMPs – either electronically (because CrediCure has instructed

- 17 -

Vanco not to accept disbursement instructions from Ballenger), or by paper check (because BB&T states that it will follow CrediCure's instructions not to permit Ballenger to write disbursement checks on the Trust Account). Because Ballenger is responsible for CrediCure's payment processing, if CrediCure's consumer clients are assessed penalties or lose DMP benefits, the common perception in the industry will be that the penalties and lost benefits are attributable to Ballenger. Thus, not only will Ballenger's goodwill and reputation suffer among its other CCA clients and prospective clients, but its reputation will be tarnished with creditors who do not receive disbursement payments.

67.     Moreover, Ballenger will suffer irreparable injury in the event that an injunction is not issued because debtors who begin receiving calls from creditors asking where there disbursement payments are will begin flooding Ballenger with calls to complain – and at this point, there is no way to ascertain the additional resources that Ballenger will need to devote to handling the influx of complaint calls, nor the negative effects that the calls will have on Ballenger's servicing of debtors for other CCAs.

68.     On the other hand, the injury to Defendant if an injunction is not issued is minimal, at best, because the debtor's payments to the Trust Account do not belong to CrediCure – but to the debtors who made payments under the belief that they would be distributed to creditors. The injury, if any, to Defendant from the request injunction certainly pales in comparison to the irreparable harm to 1,500 consumers in the absence of an injunction that maintains the status quo by permitting disbursements -- including cancellation of DMPs, the imposition late fees and other penalties, skyrocketing interest rates, foreclosures and negative credit reports – all consequences that consumers sought to avoid (and believed that they had) when they contacted CrediCure and agreed to a DMP serviced by Ballenger. Moreover, an injunction would actually protect CrediCure's reputation because it would avoid injury to its customers.

- 18 -

69.     Accordingly, the public interest is overwhelmingly in favor of a temporary restraining order that maintains the status quo by permitting the disbursement of consumers' funds now held in the Trust Account to their creditors in accordance with their DMPs.

70.     Ballenger's likelihood of success on the merits also is high.

WHEREFORE, Ballenger respectfully requests a Temporary Restraining Order that enjoins CrediCure and any of its agents, servants, employees and attorneys from taking any action that is designed to, for the purpose of, or done with the intent to prevent, prohibit or otherwise hinder Ballenger or any third party, including Vanco and BB&T, from disbursing consumer debt management plan payments from the Trust Account.

### Count II – Request for Preliminary and Permanent Injunction

71.     Ballenger incorporates by reference Paragraphs 1 through 70 of its Verified Complaint as if set forth fully herein.

72.     Plaintiff seeks an injunction that seeks to maintain the status quo by permitting Ballenger to disburse funds from the Trust Account that debtors paid under the belief that, as in the past, their funds would be redistributed among their creditors in accordance with their DMPs.

73.     Plaintiff will suffer irreparable harm to its goodwill and reputation in the industry in the absence of an injunction.  Ballenger's business success is dependent almost entirely upon its reputation as the "gold standard" in DMP payment processing.  In the absence of an injunction, Ballenger will not be able to make the 200 to 250 disbursements from the Trust Account to creditors that it must make every day in accordance with debtors' DMPs – either electronically (because CrediCure has instructed Vanco not to accept disbursement instructions from Ballenger), or by paper check (because BB&T states that it will follow CrediCure's instructions not to permit Ballenger to write disbursement checks on the

- 19 -

Trust Account).  Because Ballenger is responsible for CrediCure's payment processing, if CrediCure's consumer clients are assessed penalties or lose DMP benefits, the common perception in the industry will be that the penalties and lost benefits are attributable to Ballenger.  Thus, not only will Ballenger's goodwill and reputation suffer among its other CCA clients and prospective clients, but its reputation will be tarnished with creditors who do not receive disbursement payments.

74.      Moreover, Ballenger will suffer irreparable injury in the event that an injunction is not issued because debtors who begin receiving calls from creditors asking where there disbursement payments are will begin flooding Ballenger with calls to complain – and at this point, there is no way to ascertain the additional resources that Ballenger will need to devote to handling the influx of complaint calls, nor the negative effects that the calls will have on Ballenger's servicing of debtors for other CCAs.

75.      On the other hand, the injury to Defendant if an injunction is not issued is minimal, at best, because the debtor's payments to the Trust Account do not belong to CrediCure – but to the debtors who made payments under the belief that they would be distributed to creditors.  The injury, if any, to Defendant from the request injunction certainly pales in comparison to the irreparable harm to 1,500 consumers in the absence of an injunction that maintains the status quo by permitting disbursements -- including cancellation of DMPs, the imposition late fees and other penalties, skyrocketing interest rates, foreclosures and negative credit reports – all consequences that consumers sought to avoid (and believed that they had) when they contacted CrediCure and agreed to a DMP serviced by Ballenger.  Moreover, an injunction would actually protect CrediCure's reputation because it would avoid injury to its customers.

- 20 -

76.     Accordingly, the public interest is overwhelmingly in favor of an injunction that maintains the status quo by permitting the disbursement of consumers' funds now held in the Trust Account to their creditors in accordance with their DMPs.

77.     Ballenger's likelihood of success on the merits also is high

WHEREFORE, Ballenger respectfully requests a preliminary and permanent injunction that enjoins CrediCure and any of its agents, servants, employees and attorneys from taking any action that is designed to, for the purpose of, or done with the intent to prevent, prohibit or otherwise hinder Ballenger or any third party, including Vanco and BB&T, from disbursing consumer debt management plan payments from the Trust Account.

## Count III – Request for Declaratory Judgment under 28 U.S.C. 2201

78.     Ballenger incorporates by reference Paragraphs 1 through 77 of its Verified Complaint as if set forth fully herein.

79.     There is an actual controversy of a justiciable issue between the parties within the jurisdiction of this Court that involves the rights and liabilities of the parties under the Fulfillment Agreement.   See 28 U.S.C. §2201.  Specifically, the parties disagree with respect to their rights and liabilities under Sections 2.3, 6.4.1, 6.4.2 and 10.5 of the Fulfillment Agreement, as follows:

A.     Section 6.4.1. CrediCure's February 20, 2004, letter demands that Ballenger "immediately stop" servicing all of CrediCure's Existing Debtors and stop making disbursement payments from the Trust Account by March 1, 2004 – and that Ballenger return to CrediCure all Existing Debtor files by that same date.  See February 20 Brennan Letter, Exh. D.  Ballenger contends, however, that under Section 6.4.1 of the Fulfillment Agreement – which is applicable because CrediCure intends to partially terminate the Agreement pursuant to Section 6.3(c) – it has a right to

"retain permanent processing rights" for Existing Debtors and that the retention of those debtors' files is essential to continue to process those DMPs.

B.     Section 10.5.  The parties also disagree with respect to Ballenger's rights under Section 10.5 of the Fulfillment Agreement.  Although CrediCure demands that Ballenger stop servicing or otherwise processing the DMPs for Existing Debtors as of March 1,2004, Ballenger contends that it has an absolute right to continue providing services to Existing Debtors pursuant to Section 10.5.  The parties also disagree with respect to CrediCure's ability to begin servicing Existing Debtors and DMPs.  CrediCure's correspondence makes it clear that it plans to begin disbursing client funds to creditors.  Yet Ballenger contends that, under Section 10.5(i), CrediCure is forever prohibited from "perform[ing] any back office, fulfillment, or customer relations services'' for those Debtors for whom Ballenger has already provided services.

C.     Section 6.4.2.  The parties also disagree with respect to Ballenger's rights under Section 6.4.2 of the Fulfillment Agreement to assign CrediCure's Existing Debtors to one or more other credit counseling agencies.  Ballenger is in the process of exercising its right to assign the DMPs of all CrediCure Existing Debtors to other credit counseling agencies in accordance with Section 6.4.2.  Yet the February 23 Brennan E-mail alleges that "for practical and legal reasons," Ballenger may not assign CrediCure's Existing Debtors.

D.     Section 2.3.  The parties also disagree with respect to their rights, obligations and liabilities under Section 2.3 of the Fulfillment Agreement because CrediCure has asserted that it has a right to demand that Ballenger stop providing all disbursement services from the Trust Account as of March 1, 2004 – yet Ballenger contends that, under Section 2.3, it is "entitled at all times to maintain balances in [the] Trust Account[] sufficient to cover the payments due to Creditors and such additional

- 22 -

sums as may be reasonably be requested by Ballenger to cover unscheduled amounts required by Creditors and refunds to Debtors." Ballenger also contends that Section 2.3 requires Creditors to "afford Ballenger full access to" the Trust Account.

80.     Accordingly, antagonistic claims are present between the parties with respect to the above provisions of the Fulfillment Agreement, and because CrediCure is demanding cessation of services and return of DMP and Debtor files by March 1, 2004, these claims indicate imminent and inevitable litigation

81.     A declaratory judgment by this Court will terminate this controversy.

WHEREFORE, Plaintiff Ballenger respectfully demands:

A.     That this Court determine and adjudicate the rights and liabilities of the parties under Sections 2.3, 6.4.1, 6.4.2 and 10.5 of the Fulfillment Agreement (and all related and relevant sections); and

B.     That this Court determine and declare that Ballenger is "entitled at all times to maintain balances in [the] Trust Account[] sufficient to cover the payments due to creditors and such additional sums as may reasonably be requested by Ballenger to cover unscheduled amounts required by Creditors and refunds to debtors" – and that CrediCure must provide Ballenger with full access to the Trust Account – pursuant to Section 2.3 of the Fulfillment Agreement.

C.     That this Court determine and declare that, upon CrediCure's partial termination of the Fulfillment Agreement, "Ballenger will retain permanent processing rights for Debtors who enrolled in DMPs before the effective date of termination ("Existing Debtors'), and the [Fulfillment] Agreement will remain in full force and effect with respect to such Existing Debtors until expiration of [the Fulfillment] Agreement or termination in full" under Section 6.4.1 of the Agreement;

-23-

**D.**      That this Court determine and declare that Ballenger is the "exclusive provider of Services for Debtors for whom Ballenger has performed any Services under this Agreement, for the duration of the DMP for each such Debtor" under Section 10.5 of the Fulfillment Agreement;

**E.**      That this Court determine and declare that Ballenger is not obligated or otherwise required to turn over any files or other information to CrediCure with respect to Existing Debtors;

**F.**      That this Court determine and declare that CrediCure is prohibited from performing "any back office, fulfillment, or customer relations services for its Debtors or the clients of any other entity ... other than Ballenger" pursuant to Section 10.5 of the Fulfillment Agreement.

**G.**      That this Court determine and declare that, if CrediCure is in material breach of the Fulfillment Agreement and such breach is not cured within 30 days after it receives notice of such breach from Ballenger, that Ballenger may "at its sole option, without limiting any other remedy that might be available to it and notwithstanding anything to the contrary in [the Fulfillment] Agreement, fully terminate [the] Agreement and assign Existing Debtors to one or more other credit counseling agencies, exempt from federal tax under Section 501(c)(3) of the Internal Revenue Code, of Ballenger's choosing, including companies that may be clients of Ballenger," pursuant to Section 6.4.2 of the Fulfillment Agreement;

**H.**      That this Court determine and declare that if Ballenger assigns Existing Debtors pursuant to Section 6.4.2, it "may send a notice to Debtors on behalf of [CrediCure], and include [CrediCure's] Marks in such notice, informing Debtors that their DMPs will be or have been assigned to a new credit counseling agency" pursuant to Section 6.4.2 of the Fulfillment Agreement;

- 24 -

I.       That this Court award Ballenger reasonable attorneys' fees incurred in bringing this action, including the costs of these proceedings pursuant to Section 10.4 of the Fulfillment Agreement; and

J.       That this Court award Ballenger such other and further relief as in law and justice that Ballenger may be entitled to receive.

### Count IV – Breach of Contract

82.      Ballenger incorporates by reference Paragraphs 1 through 81 of its Verified Complaint as if **set** forth fully herein.

**83.**      Ballenger and CrediCure entered into the Fulfillment Agreement that provided, ***inter alia,*** for the payment of fees in accordance with Section 4.1 of that Agreement and pursuant to an Amendment of the fee payment provisions of the Fulfillment Agreement.  *See* Fulfillment Agreement, Exh. A, §4.1; Amendment, Exh. B.

84.      Ballenger sent invoices to CrediCure for fees owed to Ballenger that now total $478,979.28, and CrediCure has never provided written notice of any dispute over those invoices, either ten days after receipt of the invoices or at any time thereafter.

85.      By letter dated January 12, 2004, Ballenger provided written notice to CrediCure that its failure to pay Ballenger its outstanding fees constituted a serious and material breach of the Fulfillment Agreement.  See Exh. C.

86.      Thus, CrediCure has breached the Fulfillment Agreement by failing to pay Ballenger for overdue and properly charged fees.

WHEREFORE, Ballenger respectfully demands judgment against CrediCure in the amount of $478,979.28, plus reasonable attorneys' fees, interest and costs of this litigation.

- 25 -

**Count V – Anticipatory Repudiation or Breach of Contract**

87.     Ballenger incorporates by reference Paragraphs 1 through 86 of its Verified Complaint as if set forth fully herein.

88.     CrediCure, the party bound by the Fulfillment Agreement, has positively, absolutely and unequivocally refused to perform its obligations and to prevent Ballenger from exercising its rights and obligations under that Agreement pursuant to the February 20 Brennan Letter and the February 23 Brennan E-mail, including:

          A.       CrediCure's obligation to provide Ballenger with "full access" to the Trust Account under Section 2.3;

          B.       Ballenger's right to service all of CrediCure's Existing Debtors, which includes the right to continue making disbursement payments, under Sections 6.4.1 and 10.5;

          C.       CrediCure's obligation not to service or perform any other back office functions on behalf of Existing Debtors and DMPs, which includes disbursement of DMP payments; and

          D.       Ballenger's right to assign CrediCure's Existing Debtors to one or more other credit counseling agencies pursuant to Section 6.4.2.

89.     CrediCure's other conduct also evidences its positive, absolute and unconditional refusal to perform under the Fulfillment Agreement, including its written instructions to Vanco and BB&T to stop following disbursement and other instructions from Ballenger and its attempt to obtain the CrediSoft software from ICCO that it needs to begin performing back-office and other administrative functions for DMPs that Ballenger now services pursuant to the Fulfillment Agreement.

90.     CrediCure's repudiation also is so material and substantial in nature that it affects the very essence of the Fulfillment Agreement, covers the entire performance of the parties under that

- 26 -

Agreement, and serves to defeat the object of the parties – which was to provide Ballenger with exclusive rights to forever service and administer DMP plans that CrediCure referred to it for serving.

WHEREFORE, Ballenger respectfully demands judgment against CrediCure in the amount of at least $3,104,968, which are its estimated damages at this time, plus reasonable attorneys' fees, interest and costs of this litigation.

Respectfully submitted,

Robert R. Bowie, Jr. (Bar No. 00442)
Jeremy T. Gamer (Bar No. 26317)
Joshua A. Glikin (Bar No. 26852)
BOWIE & JENSEN, LLC
29 West Susquehanna Avenue, Suite 600
Towson, Maryland  21204
(410) 583-2400

*Attorneys for Plaintiff, The Ballenger Group, LLC*

- 27 -

I, **Jeffrey** Smith, Controller of The Ballenger Group, LLC, **solemnly** affirm under penalties of **perjury** that **the** contents of **the** foregoing **Verified** Complaint **are** true and accurate to the best of my knowledge, information and belief.

Jeffrey Smith, Controller
The Ballenger Group, LLC